UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIC A. LENZ,

    Plaintiff,

  v.                                                  Case No. 20-CV-1810-SCD

KILOLO KIJAKAZI,
**Acting Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

    As a symptom of his mental impairments, Eric A. Lenz regularly blows up at other people, including and especially his co-workers and supervisors. He applied for social security disability benefits alleging that his impairments—rapid-cycling bipolar disorder and intermittent explosive disorder—precluded him from working because he is unable to control his emotions in a normal work setting. His psychologist agreed, opining that Lenz had significant limitations interacting with others and responding to routine workplace changes. After a hearing, an administrative law judge denied Lenz's claim, finding that although he had severe impairments, he was still capable of performing jobs that involved limited interaction with others and other mental restrictions. The ALJ was not persuaded by the psychologist's opinions.

    Lenz seeks judicial review of that decision, arguing that ALJ erred in evaluating the opinions of his psychologist and in fashioning his work-related mental limitations. The Commissioner of the Social Security Administration contends that the ALJ did not commit reversible error in denying Lenz's claim and that substantial evidence supports his decision. I

agree with Lenz: the ALJ committed reversible error in assessing the opinions of Lenz's treating psychologist, and this error likely affected the ALJ's determination of Lenz's mental residual functional capacity—that is, the most he could do despite his limitations. Accordingly, I will reverse the decision denying Lenz disability benefits and remand the matter for further proceedings.

## BACKGROUND

Lenz had a rough childhood. The record suggests that his father was an alcoholic and didn't treat Lenz's mother well. *See* R. 533, 702, 822, 824–25.[1] After years of conflict, Lenz's parents divorced when Lenz was about eleven years old, leading him to spiral out of control. *See* R. 682, 702. He started skipping school, hanging out with older kids, and heavily using drugs and alcohol. *See* R. 547, 551, 652, 682, 702, 856–57. When Lenz was seventeen, he was hospitalized at Winnebago Mental Health Institute for six months following a bad trip on drugs. *See* R. 636–667. His mother got him released to a drug rehabilitation facility and, after completing that program, he moved back in with her. *See* R. 703, 857, 863. However, his mom kicked him out when she found out he was skipping school again and selling drugs. *See* R. 857, 863. Lenz also started using again, and he spent more time in drug rehab. *See* R. 552, 863. Because of these issues, Lenz didn't graduate from high school. *See* R. 544.

Lenz eventually met his wife (Lori), sobered up, obtained his GED, and got a job doing millwork in a warehouse. *See* R. 40, 297, 554, 682, 703, 863. During his nine years at that job, he had numerous verbal conflicts with co-workers, but his boss looked out for him and always stood up for him with upper management. *See* R. 45–48, 682. When that shop closed, Lenz started working for a competitor. *See* R. 44, 48. It didn't last long; he was fired after multiple

---

[1] The transcript is filed on the docket at ECF No. 19-2 to ECF No. 19-13.

2

Case 1:20-cv-01810-SCD   Filed 01/18/22   Page 2 of 18   Document 31

altercations and outbursts with management and co-workers. *See* R. 44, 48, 534, 682, 864, 868. Lenz tried working a few temp jobs, but he struggled mentally, and each was short-lived. *See* R. 45, 682.

Despite clearly suffering from mental-health issues, Lenz resisted treatment for years out of fear stemming from his experience while institutionalized at Winnebago. *See* R. 702. In 2011, Lenz's primary care physician prescribed him medications for mood swings and depression. *See* R. 117. The following year, Lenz applied for disability benefits, claiming that a series of mental impairments prevented him from working; the Social Security Commissioner denied the application following a hearing. *See* R. 109–27. Lenz also started therapy and counseling. *See* R. 448–50, 680–94, 695–704, 710–12, 728–34, 738–39. In September 2018, Lenz's primary care physician finally convinced Lenz to see a psychiatrist, noting that his rapid mood swings appeared more like bipolar disorder than depression. *See* R. 797–98. Lenz began seeing Gerald J. Bannasch, MD, later that same month. *See* R. 481–85. Dr. Bannasch's initial impression was that Lenz suffered from major depressive disorder and intermittent explosive disorder—a mental illness marked by episodes of unwarranted anger. R. 483.

In October 2018, Lenz applied for disability benefits again, alleging that he became disabled on May 22, 2015, due to intermittent explosive disorder, rapid-cycling bipolar disorder, depression, and sleep apnea. R. 13, 271–81, 296. While his applications were pending, Lenz (often accompanied by his wife) continued to see Dr. Bannasch. *See* R. 469–80. In December 2018, Lenz began also seeing Rosalie Easton, PhD, a clinical psychologist. *See* R. 546–554. Dr. Easton diagnosed Lenz with intermittent explosive disorder and rapid-

3

cycling bipolar disorder. R. 548. Lenz saw Dr. Bannasch and Dr. Easton regularly throughout 2019 and into 2020. *See* R. 499–527, 533–54, 557–71, 574–590, 595–631, 759–75, 815–87.

After the Social Security Commissioner denied his applications at the state-agency level, *see* R. 128–81, Lenz requested an administrative hearing before an ALJ, R. 193. On August 4, 2020, ALJ Dean Syrjanen held an evidentiary hearing on Lenz's disability applications. *See* R. 31–70. Lenz testified at the hearing. *See* R. 40–52. He discussed a long history of mental-health issues, including rapid-cycling bipolar disorder. Lenz also reported having frequent emotional outbursts at others, especially while at work. He claimed he got into numerous verbal altercations at work that his first boss overlooked. However, when he got a new job, his new supervisor was not so forgiving; he was fired after only a couple years due to constant altercations with management and co-workers. When asked what types of things set him off at work, Lenz replied, "[A]lmost anything really." R. 47. Lenz stated that he last worked for pay in 2012 or 2013. More recently, he helped his brother-in-law with snow removal and lawn mowing, working a couple hours here and there when he felt mentally capable. According to Lenz, the only reason he was able to do that job was because he trusted his brother-in-law and knew that his brother-in-law accepted him.

Lenz stated he didn't think he was capable of handling full-time work, even in an independent job setting. Although he had been resistant to mental-health treatment in the past, Lenz indicated that he had been seeing a clinical psychologist, Dr. Easton, weekly for the last year or so. Lenz reported feeling great seeing Dr. Easton and recently noticing progress in his mental health. However, he claimed to still have a long way to go. Lenz also stated he was reluctant to work given his frequent cycling between good and bad days.

Lenz's wife, Lori, also testified at the hearing. *See* R. 53–59. Lori indicated that her husband had difficulty controlling his emotions and frequently had emotional outbursts. For example, he often exhibited behavioral issues during his kids' sporting events and had even been banned from attending one daughter's events for a year due to his poor behavior. According to Lori, her husband also had outbursts at home a couple times a week, like when their dogs barked or when she made lots of noise while cooking dinner. Lori stated that she could tell when her husband was cycling based on his behavior. During a manic episode, he became anxious and fidgety and barely slept or rested. Lori indicated that her husband was sluggish and had no desire to do much of anything during a depressive episode.

The ALJ also heard testimony from a vocational expert. *See* R. 60–69. The vocational expert testified that a hypothetical person with Lenz's age (forty-three years old at the time of the hearing), education (a GED), and work experience (as a laborer) could not perform his past relevant jobs if he could work at all exertional levels but with certain non-exertional limitations. That person could, however, work as "a cleaner II," "a sweeper cleaner industrial," "a merchandise marker," "a laundry sorter," and "a laundry folder." R. 63–64. The vocational expert indicated that, if an employee had a verbal altercation with a co-worker or supervisor, he might receive one warning before being fired. According to the vocational expert, a physical altercation likely would result in immediate termination. The vocational expert testified that no jobs would be available to an employee who missed two or more days of work each month due to mental-health symptoms.

On September 16, 2020, the ALJ issued a written decision finding that Lenz was not disabled. *See* R. 9–29. The ALJ applied the standard five-step analysis. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ determined that Lenz met the insured status

5

requirements of the Social Security Act through December 31, 2017. R. 15. At step one, the ALJ determined that Lenz had not engaged in substantial gainful activity since his alleged onset date. R. 16. The ALJ determined at step two that Lenz had two severe impairments: bipolar disorder and intermittent explosive disorder. R. 16. At step three, the ALJ determined that Lenz did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 16–17. The ALJ found that Lenz had a mild limitation in his ability to understand, remember, or apply information; a moderate limitation in his ability to interact with others; a moderate limitation in his ability to concentrate, persist, or maintain pace; and a moderate limitation in her ability to adapt or manage herself. R. 17.

The ALJ next assessed Lenz's RFC. The ALJ found that Lenz had the RFC to perform a full range of work at all exertional levels but with several non-exertional limitations. R. 18. Specifically, the ALJ determined that Lenz was limited to simple, routine, repetitive tasks; low-stress jobs (defined as involving only simple decision making and few, if any, workplace changes); jobs where tasks could be performed independently and did not involve tandem tasks; and jobs involving no interaction with the public. The ALJ found that Lenz could be around or in the vicinity of co-workers, but he couldn't perform jobs that involved collaboration or interaction with co-workers to complete tasks. The ALJ also found that Lenz could tolerate no more than occasional interaction with supervisors. In assessing that RFC, the ALJ considered Lenz's subjective allegations, the medical evidence, and the medical opinion evidence and prior administrative findings. *See* R. 18–22.

The ALJ rejected Lenz's claim that he was unable to work due to extreme interpersonal issues, finding that "those issues [were] not reflected in the record." R. 21. The

6

Case 1:20-cv-01810-SCD   Filed 01/18/22   Page 6 of 18   Document 31

ALJ noted that the record contained little evidence of Lenz having issues interacting with his treating providers, "as most appointment notes indicate that [Lenz was] cooperative." *Id.* The ALJ further noted that counseling records documented underlying marital issues. According to the ALJ, "[Lenz's] interpersonal issues appear[ed] to be focused on his spouse, and not towards other people." *Id.* The ALJ indicated that Lenz's providers noted Lenz was unwilling to change and used his anger as a coping mechanism. The ALJ also indicated that the record reflected that Lenz "developed and maintained a relationship outside his marriage and worked in some capacity." *Id.*

As for the opinion evidence, the ALJ considered the medical source statement completed by Lenz's psychologist in February 2020. R. 21–22 (citing Ex. B24F [R. 780–84]). On that questionnaire, Dr. Easton opined that Lenz had "mild" and "moderate" limitations in his ability to understand, remember, and carry out instructions. R. 780. Dr. Easton also opined that Lenz had a "marked" limitation interacting appropriately with the public and co-workers, an "extreme" limitation interacting appropriately with supervisors, and a "marked" limitation responding appropriately to usual work situations and to changes in a routine work setting. R. 781. She supported that assessment by attaching a copy of a disability assessment Lenz filled out in December 2019. *See* R. 783–84. Dr. Easton further opined that Lenz's "ability to see [sic] or maintain employment is affected due to his frequent angry outbursts." R. 781. As support, she cited Lenz's diagnoses of bipolar disorder and intermittent explosive disorder.

The ALJ found persuasive Dr. Easton's opinions concerning Lenz's ability to understand, remember, and carry out instructions. R. 22.

7

However, the ALJ found unpersuasive Dr. Easton's opinions about Lenz's ability to interact with others. R. 21–22. According to the ALJ, the opined social-interaction limitations were "not well supported" because they "appear[ed] to be based on a self-assessment completed by [Lenz] and attached to the opinion." R. 21. The ALJ also noted "[i]t [was] unclear to what extend [sic] [Dr. Easton] relied on [that] assessment in forming her opinion." *Id.* The ALJ further determined that Dr. Easton's opined social-interaction limitations were "not consistent with the entirety of the record." *Id.* According to the ALJ, the record showed that Lenz's limitations interacting with others were not as extreme as described in Dr. Easton's medical source statement. The ALJ noted, for example, that "providers routinely describe[d] [Lenz] as pleasant" and that "[t]here [was] no evidence of any intensive treatment or hospitalizations." R. 21–22.

The ALJ did not mention Dr. Easton's opinion about Lenz's ability to seek or maintain employment. *See* R. 13–25.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Lenz was not able to perform any past relevant work. R. 22. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Lenz could perform. R. 22–25. Relying on the testimony of the vocational expert, the ALJ mentioned three examples: cleaner, sweeper/cleaner, and merchandise marker. *Id.* Based on those findings, the ALJ determined that Lenz had not been under a disability from his alleged onset date through the date of the decision. R. 25.

The Social Security Administration's Appeals Council denied Lenz's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

8

On December 8, 2020, Lenz filed this action seeking judicial review of the Commissioner's final decision denying his claims for social security disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 7, 8. It is now fully briefed and ready for disposition. *See* ECF Nos. 27, 29, 30.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse a Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834,

837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Lenz takes issue with ALJ's RFC assessment. His main argument is that the ALJ erred in evaluating the medical opinions of his treating psychotherapist, Dr. Easton. Because Lenz filed his application on or after March 27, 2017, the familiar "treating source rule," 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1), does not apply to his claim. Under the new regulations, an ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors. *See* 20 C.F.R. §§ 404.1520c, 416.920c. Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. §§ 404.1520c(b)(2), 416.920c(b)(2). These are the only factors that must be explained in the ALJ's decision. *Id.*

In February 2020, Dr. Easton completed a medical source statement in which she offered three separate opinions about Lenz's mental ability to do work-related activities. *See* R. 780–84. First, Dr. Easton opined that Lenz's mental impairments would cause mild or moderate limitations in his ability to understand, remember, and carry out instructions. Second, Dr. Easton opined that Lenz's impairments would cause marked or extreme limitations in his ability to interact appropriately with others and in his ability to respond to changes in a routine work setting. Third, Dr. Easton opined that Lenz's frequent angry outbursts affected his ability to seek or maintain employment. The ALJ found persuasive the first opinion, found the second opinion unpersuasive, and didn't address the third opinion. *See* R. 21–22. Lenz argues that substantial evidence does not support the ALJ's rejection of Dr.

10

Easton's opined social-interaction limitations and that the ALJ committed reversible error in not addressing Dr. Easton's opinion about his ability to seek or maintain employment.

I.  **The ALJ Erred in Evaluating Dr. Easton's Opinion Concerning Lenz's Ability to Interact with Others**

The ALJ determined that Dr. Easton's opined social-interaction limitations were not supported by or consistent with the record. Lenz takes issue with both findings.

A.  Supportability

According to the ALJ, Dr. Easton's opinion was not well supported because it appeared to be based on a self-assessment she had Lenz fill out in which Lenz claimed to have moderate or severe limitations getting along with other people, working, and participating in society. *See* R. 540–41. To be sure, when asked to identify the factors that supported her assessment of Lenz's social-interaction limitations, Dr. Easton referenced the self-assessment; she also attached a copy of the assessment to her medical source statement. *See* R. 781, 783–84. But when considering the supportability of a medical opinion, ALJs are not limited to the explanation provided within the opinion to the exclusion of all other evidence in the record. Rather, social security regulations *require* ALJs to consider the supporting explanation *and* the objective medical evidence presented by the medical source. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support . . . her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."); *see also Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021) (suggesting that a claimant could meet his burden of proving that he is disabled by identifying objective evidence in the record corroborating a treating source's statement).

The ALJ here did not consider whether any objective medical evidence presented by Dr. Easton supported her opinion. In fact, the ALJ cited Dr. Easton's treatment notes only

11

twice in his thirteen-page decision: once when evaluating whether Lenz's mental impairments were presumptively disabling, *see* R. 17 (citing BF/2 [R. 534]), and again when summarizing the medical evidence in relation to the RFC assessment, *see* R. 20 (citing BF/2 [R. 534]). Both times the ALJ referenced a single visit in January 2019. However, Dr. Easton saw Lenz approximately fifty times between December 2018 and March 2020—an average of about three visits per month. *See* R. 533–54, 833–87. The ALJ therefore either ignored Dr. Easton's treatment notes or simply didn't consider them at all. Either way, it was error. *See Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012) (finding that the ALJ erred in determining that a treating physician lacked a clinical basis for her evaluation because the ALJ considered only one of the many pages of the physician's notes).[2]

The Commissioner's attempts to downplay the ALJ's handling of Dr. Easton's treatment notes are not convincing. The Commissioner first accuses Lenz of "nitpicking" the ALJ's evaluation of Dr. Easton's opinions. *See* ECF No. 29 at 10–12. However, the Commissioner does not cite any authority to support her argument that an ALJ should limit his supportability analysis to the evidence cited on the form containing the medical opinion while ignoring dozens of pages of treatment notes that very likely formed the basis of that opinion.

The Commissioner also suggests, in conclusory fashion, that the outcome would have been the same if the ALJ had cited to more of Dr. Easton's treatment notes. *See* ECF No. 29 at 14. The Seventh Circuit has repeatedly held that administrative error like the one here is

---

[2] To be sure, at times Dr. Easton's handwritten notes are difficult to read. But the ALJ never claimed that the notes were illegible, and he never contacted Dr. Easton to clarify or supplement her handwritten treatment notes. *See, e.g., Amy H. v. Berryhill*, No. 17 CV 4559, 2019 WL 2076325, 2019 U.S. Dist. LEXIS 79220, at *13 (N.D. Ill. May 10, 2019) ("[T]he ALJ had a duty to contact Claimant's sole treating psychiatrist for clarification and supplementation because his handwritten notes are illegible.").

subject to harmless-error review and that remand is not required if the reviewing court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th Cir. 2013) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Keys*, 347 F.3d at 994–95). "[T]he harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting [the reviewing court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892. Rather, the question for a reviewing court "is now prospective—can [I] say with great confidence what the ALJ would do on remand—rather than retrospective." *Id.*

I cannot predict with great confidence that the result would be the same once the ALJ more seriously considers Dr. Easton's treatment notes, as those notes frequently document Lenz's issues interacting with others. Lenz was referred to Dr. Easton after he "blew up" at Dr. Bannasch (a psychiatrist) for pointing out his problem areas. R. 608. During his weekly therapy sessions with Dr. Easton, Lenz described constant, daily struggles with other people. *See generally* R. 533–54, 595–631, 815–87. Although his wife, Lori, was a frequent target of his angry, emotional outbursts, Lenz told Dr. Easton that he also regularly beefed with his sister, his children, referees and spectators at kids' sporting events, other drivers, and people in general. For example, he "confronted" opposing fans for sitting in the wrong section at his nephew's basketball game, R. 611; he "lost it" with his daughter when her brakes malfunctioned and she ran into the neighbor's garage, R. 618; he got kicked out of his daughter's softball tournament for arguing with the umpires, R. 828; and he stormed out of a restaurant when he felt disrespected by the service staff, R. 830. Lenz also described an incident where a girl almost ran into him on an elevator; he told Dr. Easton that talking about

13

that incident made "his fingertips and toes feel like blood is rushing to his core." R. 844. There are *many* more examples discussed within Dr. Easton's treatment notes. Perhaps more importantly, during those sessions, Lenz told Dr. Easton that he had previously been fired due to angry outbursts at co-workers and management. *See, e.g.*, R. 534, 858–59, 864–65, 868–69. In short, the treatment notes are not suggestive of an individual who might have occasional problems with his wife but would be fine working with coworkers and supervisors. Thus, unlike in the cases cited by the Commissioner, *see* ECF No. 29 at 14, the overlooked treatment notes here do seem to support the treating source's medical opinion that the claimant had more severe limitations in his ability to do work-related activities.

     Aside from ignoring the supporting treatment notes, the ALJ never explained why it was inappropriate for Dr. Easton to rely on Lenz's self-assessment when she formed an opinion about his ability to interact with others. After all, Lenz's impairments—rapid-cycling bipolar disorder and intermittent explosive disorder—are not the types of conditions that can be measured with an objective test like an x-ray or an MRI, and obviously Dr. Easton is unable to follow her patients around to observe them outside of the office. In fact, on the self-assessment form, Dr. Easton noted that Lenz's general disability score did "not reflect what makes him unable to work." R. 541, 784. She instead pointed to specific functional domains—for example, joining in community activities—that she believed captured "his inability to cope in a work environment." *Id.* Listening to Lenz describe his symptoms during their fifty therapy sessions and reviewing past medical records would have been the only ways for Dr. Easton to reach that nuanced opinion. And she presumably filtered what Lenz told her through her expertise as a clinical psychologist. The ALJ therefore did not build a logical bridge between the evidence and her conclusion that Lenz's self-assessment could not support Dr. Easton's

14

opinion. *See, e.g.*, *Rosario v. Saul*, No. 18-CV-1878, 2019 WL 3997139, 2019 U.S. Dist. LEXIS 142794, at *22–23 (E.D. Wis. Aug. 22, 2019) (finding that the ALJ erred in rejecting the opinions of the claimant's providers because they were based in part on self-reporting).

In sum, the ALJ erred in evaluating the supportability of Dr. Easton's opined social-interaction limitations.

B. **Consistency**

The ALJ provided two examples of how Dr. Easton's opined social-interaction limitations were inconsistent with the record, but neither holds up to scrutiny. First, the ALJ noted that Dr. Bannasch routinely described Lenz as "pleasant." This observation is problematic for several reasons. At times, Dr. Bannasch remarked that Lenz was "more pleasant," which must mean that there were other times when he was less pleasant. *See, e.g.*, R. 759, 763, 767. Likewise, it appears that Dr. Bannasch sought out Dr. Easton's help because of Lenz's occasional outbursts of anger during their sessions; Lenz told Dr. Easton that he didn't like Dr. Bannasch at first and that he blew up at him several times. *See, e.g.*, R. 538, 816, 834. The fact that Lenz may have been pleasant during some therapy sessions also ignores the episodic nature of his impairments and is a poor indicator of how Lenz would act in a typical work environment, which involves stressors that are absent in a treatment setting. *See, e.g.*, *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."); *Grzegorski v. Saul*, No. 19-CV-1661, 2020 WL 5047555, 2020 U.S. Dist. LEXIS 155646, at *20 (E.D. Wis. Aug. 26, 2020) ("[A]ny inference from the fact that [the claimant] is sometimes able to appear with 'normal behavior, normal mood, appropriate demeanor,' etc. . . . during her medical appointments is limited,

15

given that mental health patients are often much more comfortable with familiar treatment providers than they would be in a work setting."). The ALJ therefore did not build a logical bridge between the evidence and his finding that Lenz's occasionally pleasant demeanor was inconsistent with Dr. Easton's opinion.

Second, the ALJ thought that Dr. Easton's opinion was inconsistent with the fact that Lenz did not receive intensive treatment or hospitalizations. But the ALJ did not explain what he meant by "intensive" or why Lenz's weekly therapy sessions and various medications did not qualify. Nor did the ALJ explain why he would expect someone with Lenz's impairments—bipolar disorder and intermittent explosive disorder—to be hospitalized if he really did have severe symptoms. Some mental disorders—maybe even most—can be disabling without requiring hospitalization. Our case is therefore similar to *Grzegorski*, a case cited by Lenz where I reversed an ALJ for making the same error in logic. *See Grzegorski*, 2020 U.S. Dist. LEXIS 155646, at *9–10. Although the record notes that Lenz resisted mental-health treatment for many years, there is no evidence that he ignored treatment recommendations after he started seeing Dr. Bannasch and Dr. Easton. The ALJ therefore did not build a logical bridge between the evidence and his finding that the lack of intensive treatment or hospitalizations was inconsistent with Dr. Easton's opinion.

In sum, the ALJ erred in evaluating the consistency of Dr. Easton's opined social-interaction limitations.

## II. The ALJ Erred by Failing to Address Dr. Easton's Opinion that Lenz Would Have Difficulty Seeking or Maintaining Employment

The ALJ did not address Dr. Easton's overall conclusion that Lenz's frequent angry outbursts affected his ability to seek or maintain employment. The Commissioner suggests that this error was harmless because that opinion was "similarly unsupported by any objective

16

Case 1:20-cv-01810-SCD   Filed 01/18/22   Page 16 of 18   Document 31

medical evidence, findings, or other factors." ECF No. 29 at 12 (citing R. 781). But Dr. Easton explicitly noted on the medical source statement that her opinion was based on her psychiatric diagnoses: rapid-cycling bipolar disorder and intermittent explosive disorder with oppositional defiant features. R. 781. The Commissioner does not explain how those two diagnoses—both of which seem likely to produce angry outbursts—do not support Dr. Easton's opinion. Also, like the opined social-interaction limitations, Dr. Easton's bottom-line opinion about Lenz's ability to do work-related activities presumably was based on her extensive treatment experience with Lenz. Based on the record before me, I cannot say that the ALJ's failure to address Dr. Easton's opinion about Lenz's ability to seek or maintain employment was harmless.

\* \* \*

Because the ALJ's errors in evaluating Dr. Easton's opinions likely impacted the RFC assessment, his decision must be reversed. Accordingly, I don't need to address Lenz's other arguments, both of which relate to the RFC.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in evaluating the opinions of Lenz's treating psychologist. Thus, I **REVERSE** the Commissioner's decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the Commissioner should also address Lenz's other claimed errors regarding the ALJ's RFC assessment. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 18th day of January, 2022.

_____
STEPHEN C. DRIES
United States Magistrate Judge